# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 22-192** |
| | : | |
| **FRANCIS J. BATTISTA** | : | |

---

**Diamond, J.**                                                                **June 9, 2026**

<u>**MEMORANDUM**</u>

After a 13-day trial, the jury found that from March 2020 to June 2021, Defendant Francis J. Battista stole $8.4 million in COVID-19 relief funds by repeatedly misrepresenting to the Small Business Administration both his finances and the COVID-caused losses his businesses and employees (almost all fictitious) had sustained. Indeed, to the present day Battista has uttered so many untruths both to further his crimes and obstruct his prosecution that it is easy to lose count. Although Battista was represented successively by three CJA lawyers through trial, after his conviction, he privately retained counsel and informed Probation that his net worth exceeded $350,000. Battista nonetheless asks the Court to pay for trial and hearing transcripts, averring (as he had through trial) that he is "totally indigent." (Doc. No. 287 at 1.) The Government objects to the request. (Doc. No. 294.) Because I do not credit Battista, I will not authorize payment for the transcripts. Informing my finding are Battista's years-long dishonesty and recalcitrance, which I set out here.

## I. BACKGROUND

### A. False Claim of Indigency; Phony Handwriting Exemplar

When the Government began investigating Battista in June 2020, he paid the Blank Rome law firm a $48,000 retainer and then retained a second firm for $25,000. (Gov't Tr. Ex. 230b at 15, 19.) Yet, two years later, he swore to indigence, and the Court appointed Jonathan McDonald

1

under the Criminal Justice Act.    (Doc. No. 7); see 18 U.S.C. § 3006A(a).  The trial evidence showed, however, that by 2022, Battista had stolen millions of dollars in relief funds.

Given that many of the suspect loan applications were handwritten, in May 2022 the grand jury served Battista with a subpoena for a handwriting exemplar, which he was to provide in the Green Federal Building, immediately adjacent to the Philadelphia Federal Courthouse.  (Doc. No. 102 (Ex. 1).)  On the agreed upon day, Battista insisted that he had to attend the funeral of someone he declined to identify.  (Id. (Ex. 2).)  When the Government required him to appear as scheduled, Battista went to the Nix Federal Building, refusing to go to the Green Building (some three blocks away).  (Id.)  Federal agents declined Mr. McDonald's request to escort Battista to the Green Building.  (Id.)

Battista arrived for the exemplar an hour late, repeatedly shouted "fuck this," and stormed out.  (Id.)  The Government sought an arrest warrant; the Court instead gave Battista ten days to comply with the grand jury subpoena.  Initially refusing to respond to the Government's inquiries, Battista eventually agreed that on June 7, 2022, he would provide the exemplar.  On that day, Battista told agents that he had injured his writing hand the night before.  (Id. (Ex. 3).)  The hand had a splint with a bandage wrapped around it.  (Id.)  Battista said that the night before, his doctors had prescribed morphine for the resulting pain.  (Id.)  He removed the splint so that he could give the exemplar.  (Id.)  His writing was extremely slow, labored, almost unreadable, and useless for exemplar purposes.

The medical records from Battista's June 6 visit to Urgent Care state that he had a tiny "superficial laceration" on his right pinky.  (Id. (Ex. 4).)  The records included the forms Battista had completed and signed.  (Id.)  On the night of June 6, his handwriting was legible, reasonably clear, and bore no resemblance to the "exemplar" Battista gave the next morning.  (Id. at 22:18–

2

20.)  After leaving Urgent Care on June 6, Battista drove himself to a nearby hospital, where he received an injection of lidocaine (not morphine).  Although the doctors prescribed no further treatment, Battista asked them to place a splint on his finger.  (Id. at 29:24–30:7.)

Battista plainly had lied about his "injury" to obstruct the grand jury's investigation.  He was unsuccessful.  On June 16, 2022, Battista was charged in a 36-count Indictment.  (Doc. No. 1); 18 U.S.C. §§ 2, 641, 1028A(a)(1), 1343, 1957.

### B.     Second and Third Appointments of CJA Counsel; Competency Determination

Allowing Mr. McDonald to withdraw in October 2022, I appointed Carina Laguzzi to represent Battista.  (Doc. No. 27.)  Ms. Laguzzi subsequently moved to withdraw because Battista refused to cooperate with her, making it impossible to defend him.   (Doc. Nos. 73, 74.) Significantly, Ms. Laguzzi "state[d] she has no information as to [Battista's] financial situation [or] as to whether [he] is financially able to obtain counsel, or make partial payment for representation." (Doc. No. 74 at 4.)

At a July 12, 2023 status hearing, Ms. Laguzzi reported that Battista remained recalcitrant. (Doc. No. 77 at 3:6–13.)  Battista accused Ms. Laguzzi of being untruthful, and said that he had fully cooperated with her.  (Id. at 4:2–19.)  I discredited Battista and found that he again was seeking to obstruct proceedings.  (Id. at 4:20–5:18.)  I gave him a week to reform his conduct. (See id.)

Less than a week later, Ms. Laguzzi reported that Battista remained recalcitrant, and requested "a hearing for status to determine if a competency evaluation and hearing is [sic] necessary." (Doc. No. 79.)

At the July 25 status hearing, Battista read from a prepared statement that he was fully cooperating with Ms. Laguzzi, that she was untruthful because she had an unidentified "conflict

of interest," and that I should remove her and appoint a third CJA lawyer.  (Doc. Nos. 80, 81, 101 at 3:14–7:19.)  I discredited his allegations.  Without objection, I found there were reasonable grounds to question Battista's competence, ordered the Bureau of Prisons to evaluate his competency, and ordered Battista's detention to ensure that the evaluation would take place.  (Id. at 7:20–8:12.)

When Ms. Laguzzi became unavailable, I appointed Jeremy Ibrahim to represent Battista. (Doc. No. 102 at 3:14–15, 4:22–5:2.)  I then conducted a competency hearing and, as confirmed by BOP's expert evaluation, found Battista was competent to stand trial and ordered his release from custody.  (Doc. Nos. 123, 124.)

By December 2023, I had granted several continuances (without Government objection) to allow Mr. Ibrahim time to review voluminous discovery and prepare a defense.  (Doc. Nos. 14, 43, 64, 132, 138; see Doc. Nos. 11, 40, 59, 120, 136.)

### C.    Another Attack on Counsel

On April 3, 2024, I learned that Battista had filed a complaint against Mr. Ibrahim with the Pennsylvania Disciplinary Board and thus sought the "immediate appointment" of new counsel. (See Doc. No. 161.)  In an eight-page letter, Battista told Mr. Ibrahim that he had secretly recorded their conversations.  The letter also included allegations of Mr. Ibrahim's misrepresentations, communication failures, and unspecified conflicts of interest—all quite similar to those Battista had made against Ms. Laguzzi.  (Doc. No. 185 at 2:24–25.)

I conducted a status hearing on April 17, at which I admonished that Battista might well have violated state law.  (Id. at 5:2–10); see 18 Pa. Cons. Stat. § 5703 (third degree felony to audio record another without his permission).  I discredited Battista's allegations and found that his Disciplinary Board complaint was yet another attempt at obstruction.  (Id. at 3:1–4.)  Because "the

4

practice of the Pennsylvania Disciplinary Board when it receives a complaint about a lawyer from a criminal defendant who is on trial is to dismiss the complaint and let the judge deal with the complaint," I found that "there is no or will be no complaint pending against Mr. Ibrahim." (Id. at 3:5–11.)  In fact, the Disciplinary Board never docketed Battista's complaint.  See Attorney Detail, Disciplinary Bd. of the Supreme Ct. of Pennsylvania (last visited June 5, 2026), https://www.padisciplinaryboard.org/for-the-public/find-attorney/attorney-detail/53019 [https://perma.cc/8FHV-BEU4].  Mr. Ibrahim (a vastly experienced and capable criminal defense attorney) confirmed that he would continue to use his best professional efforts on Battista's behalf. (Id. at 3:12–14.)  I thus ruled that there were no grounds to replace Mr. Ibrahim with a fourth CJA lawyer.  Battista declined to represent himself.  (Id. at 7:5–13.)

### D.      Specious Guilty Plea

On the first day of trial, Battista's "Omnibus" *pro se* Motion (Doc. No. 231) (apparently filed by Mrs. Battista) appeared on the docket.  Some 300 pages in length, the Motion contained innumerable complaints and allegations, including requests for my recusal and the removal of Mr. Ibrahim.  (See id.)  Battista also asked me to continue trial so that he could retain private counsel, presumably with family funds.  (See id.)  I denied the Motion and discredited the continuance request as yet another obstruction effort. (Doc. No. 232.)  Mr. Ibrahim continued to represent Battista.

In the middle of jury selection the following day, Mr. Ibrahim and the prosecutor announced that Battista had entered into a comprehensive Guilty Plea Agreement.  (Doc. No. 235.) Along with an Acknowledgement of Rights Form, Battista had reviewed and signed the Agreement, which provided that he would plead guilty to one count of wire fraud, one count of aggravated identity theft, and one count of money laundering.  (Doc. No. 289.)  Before I could

conduct the colloquy required by Criminal Rule 11(b)(1), however, Mr. Ibrahim stated that based on Battista's "own understanding" of the Guilty Plea Agreement, Battista believed that if I accepted the plea, he would not be remanded.  I explained that the Agreement included no such provision, and twice asked Battista if he wished to plead guilty.  Battista refused to answer, stating that "the issues" raised in his *pro se* "Omnibus" Motion "still stand."  In these circumstances, I did not (and could not) accept Battista's "guilty plea," which was yet another attempt to obstruct.

### E.    Trial

Before trial, the Government agreed to the dismissal of 14 of the 36 counts brought against Battista.  (Doc. Nos. 229, 230.)  Over some ten days, the Government presented abundant evidence of the innumerable frauds and falsehoods by which Battista stole millions from the SBA's Paycheck Protection Program and Economic Injury Disaster Loan relief—both created to help unpaid employees of businesses that had suffered severe COVID-related economic losses.  See DiPietro v. Archbishop Wood High Sch., 711 F. Supp. 3d 488, 492 (E.D. Pa. 2024); HAPCO v. City of Philadelphia, 482 F. Supp. 3d 337, 366 (E.D. Pa. 2020).  Battista submitted 19 fraudulent loan applications, seeking over $10 million for fictitious businesses that had no employees and had sustained no COVID-related losses.  (Gov't Tr. Ex. 1a–19j.)  He identified himself as the borrower on just one fraudulent application.  (Gov't Tr. Ex. 6a.)

Although Crystal Battista was not charged, the evidence showed that she helped her husband commit numerous frauds.  For instance, Mrs. Battista forged many tax documents required to obtain the SBA loans, using preparer tax identification names and numbers from the accounting firm that had previously employed her.  (Gov't Tr. Exs. 2b–c, 117.)  Moreover, from April 2020 to September 2021, Battista and his wife received unemployment benefits, each certifying to the Commonwealth every week that he or she had not worked or earned money—

statements that were completely at odds with the loan applications (in which Battista sought, *inter alia*, funds to pay for hours he, his wife, and innumerable others had purportedly worked).  (Gov't Tr. Ex. 83a–84d.)

Battista listed as loan applicants past business partners and other family members, including his father.  Battista even used the name of a late family friend, renewing the deceased's Pennsylvania ID card to circumvent one loan's "selfie requirement."  (See, e.g., Gov't Tr. Exs. 3g, 4a–n, 80a–g, 82a–b.)

Each application included a certification as to the truth of the information Battista provided and the authenticity of supporting documents he submitted.  In fact, the applications and related materials were replete with falsehoods.  The Government presented dozens of bank documents and verification letters that Battista had falsified, payroll records that Battista had fabricated, and tax documents that Battista (and his wife) had forged.  (See Gov't Tr. Exs. 1a–19j.)  For instance, on a March 31, 2020 application, Battista certified (in his wife's name) that "Francis Joseph Capital" (a sham business) had 19 employees.  (Gov't Tr. Ex. 13a at 3.)  Thirty-eight days later, however, he certified on another application (again in Mrs. Battista's name) that the same business had 119 employees.  (Gov't Tr. Ex. 14a at 1.)  He joked with confederates about his misrepresentations. (See Gov't Tr. Exs. 462 at 7 ("Lol.  I just picked a number [in providing payroll data for one loan application]."), 319c at 1 ("[P]ut your dog on the books.  You can delete this email.").)  Even after agents interviewed Battista's confederates, searched his home, and recovered inculpatory documents, Battista continued to submit fraudulent loan applications.  (Doc. No. 323 at 3:15– 4:10.)

The Government proved that Battista spent loan moneys he received on himself, his family, and poorly performing stocks.  (See Gov't Tr. Ex. 29c.)  In May 2020, Battista boasted that he and

his wife had a combined net worth of $5.9 million.  (Gov't Tr. Ex. 329a.)  On May 21, Battista arranged for his wife to purchase a Honda Odyssey for some $36,000.  (Gov't Tr. Ex. 119a.)  One month later, he offered to pay $1.5 million in cash for a waterfront property in Melbourne Beach, Florida.  (Gov't Tr. Exs. 116a–*l*.)  Once again, Battista spent over $73,000 to retain two law firms when the Government began investigating him.  (Gov't Tr. Ex. 230b at 15, 19.)  Battista also used the stolen funds to pay for his children's private school tuition, then claimed (dishonestly) that he had been "overcharged."  (Gov't Tr. Exs. 118a–c.)

Battista used relief funds to further his fraudulent efforts.  For instance, he purchased a franchise of Lendio, a small business loan platform that matched borrowers with SBA-approved lenders.  (Gov't Tr. Exs. 90a–97.)  From May 2020 to December 2021, Battista earned commissions for loans he routed through Lendio—including some of his own phony applications, thus adding to his ill-gotten gains by more than $40,000.  (Gov't Tr. Ex. 98.)

Battista's obstruction efforts continued.  He threatened a confederate he thought was helping the Government.  (Gov't Tr. Ex. 468 at 1 ("I'm going to smack the shit out of every person that hyped these [G]overnment fucks up and tried to save themselves with their self sufficing [*sic*] lies.  You are fucking on notice . . .").)

The Government thus proved that for some 15 months, Battista stole $8.4 million from the SBA.  By the time of Battista's arrest, the Government had recovered $6.3 million.  Throughout, Battista claimed indigence and was successively represented by CJA-appointed lawyers.

### F.    Post-Trial Proceedings

The jury convicted Battista of all the remaining 22 charges: 12 counts of wire fraud, 3 counts of aggravated identity theft, and 7 counts of money laundering.  (Doc. No. 264); 18 U.S.C. §§ 2, 1028A(a)(1), 1343, 1957.  On March 5, 2025 (five weeks after trial concluded), Battista

retained Jack McMahon, who entered his appearance.  (Doc. No. 279.)  I allowed Mr. Ibrahim to withdraw.  (Doc. No. 281.)  On April 23, Battista signed a financial disclosure form, in which he informed Probation that he owned his home in Aston (a Philadelphia suburb) and that his net worth was $355,436.  (Def.'s Short Form Statement at 2.)  This is consistent with public records showing that on September 19, 2025, Mrs. Battista (acting as "attorney-in-fact" for her husband) recorded a notice of lis pendens with the Delaware County Recorder of Deeds at Deed Book 7078, page 2026, as Instrument No. 2025034710, asserting that since 2016, the couple had owned the Aston property.

Remarkably, less than three months later, Mr. McMahon stated that because Battista was indigent, the Court should pay for trial and pretrial transcripts that Mr. McMahon wished to review.  (Doc. No. 284.)  In light of Battista's substantial net worth, his home ownership, the $2.1 million he stole that had not been recovered, and his having hired prominent counsel, I denied his request.  (Doc. No. 285.)   Battista moved for reconsideration, requesting an *ex parte* hearing into his finances (as allowed by the Criminal Justice Act).  (Doc. Nos. 286 (errant filing), 287); see 18 U.S.C. § 3006A(e)(1).  Mr. McMahon was purportedly "hired by [Battista]'s wife with a small amount of money" after she alone had inherited insurance proceeds from a policy held by Battista's mother. (Doc. No. 287 at 1.)  The Government, which objected to reconsideration, noted that Battista was the co-executor of his mother's estate, which was still in probate.  (Doc. No. 294 at 4.)

I conducted the *ex parte* hearing on September 4, 2025.  (Doc. Nos. 298, 303, 304.)  Mr. McMahon had never seen the financial disclosure form Battista had signed and submitted to Probation, and offered no evidence during the hearing.  (Doc. No. 303 at 3:4–9.)  Rather, he said that he would promptly provide the documents that Probation needed to verify that Battista was

indigent. (Doc. No. 301 at 1.) When he failed to so do for two weeks, I ordered Battista to produce these documents, explaining that if he did not do so, I would "conclude that, because he has substantial assets, he must himself pay for the transcripts he seeks." (Id. at 2.)

More than eight months later, Mr. McMahon provided only a few of the documents Probation requested. Because the September 4 hearing was *ex parte*, I may not here discuss these materials in any detail. (Doc. Nos. 303, 304); see 18 U.S.C. § 3006A(e)(1); CJA Guidelines, Vol. 7, Part A, § 310.30(a) ("Ex parte applications for services other than counsel under 18 U.S.C. § 3006A(e) . . . must not be revealed without the consent of the defendant."). Suffice to say, they are incomplete, do not establish Battista's indigence, and do not show that Battista's wife alone hired Mr. McMahon or that only she inherited from the estate of Battista's mother.

Finally, for the third time, Battista has sought my recusal. (Doc. Nos. 306, 308.) I denied that request earlier today. (Doc. No. 331.)

## II.    LEGAL STANDARDS

The Criminal Justice Act provides criteria by which indigent defendants can obtain both Court-appointed counsel and Court-provided defense services:

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1). These services "are available to persons who are eligible under the CJA, including persons who have retained counsel but who are found by the court to be financially unable to obtain the necessary services." CJA Guidelines, Vol. 7, Part A, § 310.10.10(b).

The Third Circuit has held that the "defendant bears the burden to prove he is unable to

pay for the cost of representation." United States v. Konrad, 730 F.3d 343, 346 (3d Cir. 2013) (citing United States v. Evans, 155 F.3d 245, 252 n.8 (3d. Cir. 1998); see United States v. Lefkowitz, 125 F.3d 608, 621 (8th Cir. 1997); United States v. Harris, 707 F.2d 653, 661 (2d Cir. 1983). "To the extent there are gaps in [the defendant]'s financial disclosures, the fault lies with [the defendant], who is responsible for 'providing the court with sufficient and accurate information upon which the court can make an eligibility determination.'" United States v. Farris, No. 20-173, 2025 WL 1346870, at *3 (E.D. Pa. May 8, 2025) (quoting CJA Guidelines, Vol. 7, Part A, § 210.40.20(f)).

In determining a defendant's eligibility, I may consider almost all his assets, including the value of his real property. See United States v. Wilson, 597 F.3d 353, 358–59 (6th Cir. 2010) (The CJA does "not draw strict lines about the kinds of income and assets that courts may consider in issuing reimbursement orders."). The Third Circuit has ruled that "jointly held property has been considered when determining a defendant's ability to pay." Konrad, 730 F.3d at 349.

Significantly,

> The Guide to Judiciary Policy Guidelines for Administering the CJA and Related Statutes explicitly recommends an evaluation of financial eligibility after the presentencing report becomes available "in order to make a final determination concerning whether the person then has funds available to pay for some or all of the costs of representation."

Id. at 346–47 (quoting Vol. 7, Part A, § 210.40.30).

Finally, through his January 31, 2025 conviction, the Court authorized CJA payments for Battista of over $128,000 in counsel fees and over $112,000 in defense services.

## III.   DISCUSSION

The record shows that Battista is not and was not indigent. Rather, just as he stole $8.4 million in COVID relief funds, he has effectively stolen over $240,000 in CJA funds. Battista has

11

misrepresented to the SBA, the Government, and the Court at every opportunity—usually with respect to his finances and those of his wife (who helped him steal relief funds). He has twice before retained private counsel and then dishonestly pled indigence. All of this is of a piece with his present claim of indigence, for which he offers no credible support. The few documents he belatedly submitted are incomplete, inadequate, and do not impugn what he told Probation: that his net worth exceeds $350,000. (See Def.'s Short Form Statement at 2.) Plainly, Battista has not met his burden of proving he is indigent. Konrad, 730 F.3d at 346.

Because Battista has elected to proceed *ex parte*, the Court's ability to learn the truth about his finances is limited. 18 U.S.C. § 3006A(e)(1); see Wharton v. Vaughan, No. 01-6049 (E.D. Pa. May 7, 2019), Doc. No. 165 at 4 (An adversarial proceeding is essential for the Court to learn material facts); Wharton v. Superintendent Graterford SCI, 95 F.4th 140, 145 (3d Cir. 2024). Given Battista's apparent refusal to disclose his finances fully, in the absence of any adversarial process, there cannot be an accurate evaluation of his claimed indigence. Probation is an arm of the Court with modest investigative resources; it is not an adversarial party. In the face of Battista's continued recalcitrance, Probation is largely unable to make a full and accurate determination of Battista's finances. See United States v. Trotter, 321 F. Supp. 3d 337, 340 (E.D.N.Y. 2018) ("The resources of the Probation Department are limited."). With Battista's agreement, however, the Government could do so. Having been convicted, Battista no longer has a legitimate need to insist on an *ex parte* presentation.

> The purpose of the ex parte hearing [on a § 3006A(e)(1) application] is to allow the defense to avoid prematurely revealing its theory of the case to the [G]overnment.

United States v. Robinson, 95 F.3d 1153, slip op. at 11 (6th Cir. 1996) (per curiam) (citing United States v. Nichols, 21 F.3d 1016, 1018 (10th Cir. 1994)); see Nichols, 21 F.3d at 1017 n.1 ("The defendant . . . can waive the ex parte hearing.").

I am thus prepared to conduct an adversarial hearing respecting Battista's claimed indigence. With Battista's agreement, the Government would participate. If, after such a proceeding, the record confirms that Battista is indigent, the Court will provide the transcripts he seeks. If Battista refuses to allow an adversarial proceeding, it can only be because he does not wish to disclose his finances truthfully. If my finding that he is not indigent remains unchanged, this matter will proceed to sentencing.

## IV.    CONCLUSION

The record presently shows that Battista has effectively stolen almost a quarter of a million dollars in CJA funds and now asks me to authorize additional CJA expenditures to which he is not entitled. His longstanding and continuing dishonesty is especially offensive because it makes these CJA funds unavailable to the truly indigent, just as his theft of SBA monies made those funds unavailable to those who actually sustained severe COVID-related losses.

I will nonetheless deny Battista's Moton for Reconsideration without prejudice. He may present evidence of his indigence at an adversarial proceeding. If he declines to do so, I will deny his Motion with prejudice.

An appropriate Order follows.

**BY THE COURT.**

*/s/ Paul S. Diamond*
_____

Paul S. Diamond, J.

13